IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

STATE AUTOMOBILE MUTUAL
INSURANCE COMPANY,

      Plaintiff/Counter-Defendant,

v.                                                                    No. 07-1197

R.H.L., INC. d/b/a
TRENTON APARTMENTS, LTD.,

      Defendant/Counter-Plaintiff.

_____

ORDER GRANTING IN PART AND DENYING IN PART
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT

_____

*INTRODUCTION*

Before the Court are the cross-motions of the Plaintiff, State Automobile Mutual Insurance Company ("State Auto") and the Defendant, R.H.L., Inc. d/b/a Trenton Apartments, Ltd. ("RHL"). For the reasons set forth herein, the motions are GRANTED IN PART AND DENIED IN PART.

*FACTS AND BACKGROUND*

This case arises out of structural damage to an apartment complex for the elderly known as the Holiday House of Trenton in Trenton, Tennessee (the "Property"). The Property had been insured by State Auto since 1990. On or about April 14, 2007, the Plaintiff issued a renewal policy of insurance to RHL, providing coverage on the Property through April 14, 2008 (the "Policy"). The fifty-two unit complex was built in the early 1980s. In early June 2007, Ramona Scarborough, the site manager of the Property, observed that the flooring in two of the units was weakened. RamJack, a foundation stabilization firm in Milan, Tennessee, was contracted to investigate the problem and reported that the building was in danger of collapse due to extensive water damage. RamJack

performed temporary shoring work.  On or about June 7, 2007, the Defendant filed a claim under

the Policy, which was denied by State Auto.  The Plaintiff retained an independent adjuster to

investigate the loss, as well as a forensic engineer, Martin Ellison of Donan Engineering, to assist

in determining the cause and/or origin of the issues reported by the insured.  It was Ellison's

conclusion that "[t]he floor undulations have occurred due to the girder and floor joists deterioration.

This deterioration has also allowed for additional deflection to the floor system.  This has occurred

over a number of years and is not from a recent single occurrence."  (Mem. in Supp. of State Auto.

Mut. Ins. Co.'s Mot for Summ. J., Ex. 2 (Report of Martin Ellison of Donan Engineering dated June

28, 2007) at Bates Stamp RHL00116.)  State Auto seeks a declaratory judgment that the Policy

excludes coverage for the loss claimed by RHL.  The Defendant has filed a counterclaim under

Tennessee Code Annotated § 56-7-105 alleging bad faith.

*STANDARD OF REVIEW*

> Summary judgment is proper if "there is no genuine issue as to any material fact
> [such that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.
> 56(c).  But "summary judgment will not lie if the . . . evidence is such that a
> reasonable jury could return a verdict for the non-moving party."  Anderson v.
> Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).
> In considering a motion for summary judgment, the court must construe the evidence
> in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).
> The movant therefore has the burden of establishing that there is no genuine issue of
> material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L.
> Ed. 2d 265 (1986); Barnhart v. Pickrel, Schaeffer & Ebeling Co., 12 F.3d 1382,
> 1388-89 (6th Cir. 1993).  But the non-moving party "may not rely merely on
> allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2); *see* Celotex, 477
> U.S. at 324, 106 S. Ct. 2548; Searcy v. City of Dayton, 38 F.3d 282, 286 (6th Cir.
> 1994).  The non-moving party must present "significant probative evidence" to show
> that there is more than "some metaphysical doubt as to the material facts."  Moore
> v. Philip Morris Co., 8 F.3d 335, 339-40 (6th Cir. 1993).

Ferro Corp. v. Cookson Group, PLC, 585 F.3d 946, 949 (6th Cir. 2009).  "The standard of review

2

for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." Id. "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts . . . Rather, the court must evaluate each party's motion on its own merits." Id. at 949-50 (quoting Taft Broad. Co. v. United States, 929 F.2d 240, 248 (6th Cir. 1991)).

*RELEVANT POLICY PROVISIONS*

The Policy provides that the insurer "will pay for direct physical loss or damage to Covered Property[1] at the premises . . . caused by or resulting from any Covered Cause of Loss." (Businessowners Special Prop. Coverage Form at 1.) "Covered Causes of Loss" include "[r]isks [o]f [d]irect [p]hysical [l]oss unless the loss is . . . [e]xcluded. (Businessowners Special Prop. Coverage Form at 2.) Under the heading "Exclusions," the Policy states in pertinent part as follows:

1.      We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

                          *       *       *

g.      Water

        (1)      Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not;

        (2)      Mudslide or mudflow;

---

[1]State Auto notes that, under the Policy, "Covered Property" does not encompass "[l]and (including land on which the property is located), water, growing crops or lawns." (Policy, BP 00 02 12 99, at 2.) However, the insured does not appear to be seeking coverage for damage to land.

(3)     Water that backs up or overflows from a sewer, drain, or sump; or

(4)     Water under the ground surface pressing on, or flowing or seeping through:

     (a)     Foundations, walls, floors or paved surfaces;

     (b)     Basements, whether paved or not; or

     (c)     Doors, windows or other openings.

\*     \*     \*

2.     We will not pay for loss or damage caused by or resulting from any of the following:

\*     \*     \*

i.     Collapse, except as provided in the Additional Coverage for Collapse.  But if collapse results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

\*     \*     \*

3.     We will not pay for loss or damage caused by or resulting from . . .

[c.     Negligent Work

Faulty, inadequate or defective:

(1)     Planning, zoning, development, surveying, siting;

(2)     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

(3)     Materials used in repair, construction, renovation or remodeling; or

(4)     Maintenance . . .]

But if an excluded cause of loss . . . results in a Covered Cause of Loss, we will pay for the loss or damage caused by that Covered Cause of Loss.

(Policy, BP 00 02 12 99, at 9-12.)

4

h.      "Fungi," Wet Rot, Dry Rot And Bacteria

Presence, growth, proliferation, spread or any activity of "fungi," wet or dry rot or bacteria.  But if "fungi," wet or dry rot or bacteria results in a "specified cause of loss," we will pay for the loss or damage caused by that "specified cause of loss."

This exclusion does not apply:

(1)     when "fungi," wet or dry rot or bacteria results from fire or lightning; or

(2)     To the extent that coverage is provided in the Additional Coverage - Limited Coverage For "Fungi," Wet or Dry Rot And Bacteria (contained in the Limited Fungi or Bacteria Coverage) if any, with respect to loss or damage by a cause of loss other than fire or lightning.

(Policy, BP2171(11/02), at 1.)  The additional limited coverage provides that the insurer will pay under the Policy for

(a)     Direct physical loss or damage to Covered Property caused by "fungi," wet or dry rot or bacteria, including the cost of removal of the "fungi," wet or dry rot or bacteria;

(b)     The cost of tear out and replace any part of the building or other property as needed to gain access to the "fungi," wet or dry rot or bacteria; and

(c)     The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that "fungi," wet or dry rot or bacteria are present.

(Policy, BP2171 (11/02), at 1.)  Coverage is available where the "fungi," wet rot, dry rot or bacteria result from a "specified cause of loss" other than fire or lightning that occurred "during the policy period and only if all reasonable means were used to save and preserve the property from further damage at the time of and after that occurrence."  (Policy, BP2171 (11/02), at 1.)  "Fungi," wet or dry rot or bacteria coverage is limited to $15,000.  (Policy, BP2171 (11/02), at 1.)

The Policy also offers additional coverage for collapse, to-wit:

5

(1)    We will pay for direct physical loss or damage to Covered Property, caused by collapse of a building or any part of a building insured under this policy, if the collapse is caused by one or more of the following:

           *       *       *

(a)    The "specified cause of loss" or breakage of building glass, all only as insured against in this policy;

(b)    Hidden decay;

           *       *       *

(f)    Use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of the construction, remodeling or renovation.  However, if the collapse occurs after construction, remodeling or renovation is complete and is caused in part by a cause of loss listed . . ., we will pay for the loss or damage even if use of defective material or methods in construction, remodeling or renovation, contributes to the collapse.

(Policy, BP 00 02 12 99, at 3.)  "Specified cause of loss" is defined under the Policy as "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; sinkhole collapse; volcanic action; falling objects; weight of snow, ice or sleet; water damage."  (Policy, BP 00 02 12 99, at 23.)  "Water damage means accidental discharge or leakage of water or steam as the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam."  (Policy, BP 00 02 12 99, at 23.)

## ASSERTIONS OF THE PARTIES AND ANALYSIS

### Loss-in-Progress Doctrine.

The parties agree that Tennessee law governs this action.  *See* <u>Alvord Inv., LLC v. The Hartford Fin. Servs. Group, Inc.</u>, 660 F. Supp. 2d 850, 854 n.6 (W.D. Tenn. 2009) (Tennessee courts

apply substantive law of the state in which the insurance policy was issued and delivered).  State Auto argues that the loss-in-progress doctrine bars the insured's recovery.  "A loss in progress is one that is a 'known loss' at the time that the insured enters into the insurance contract.  In other words, a known loss that begins prior to the purchasing of insurance coverage and continues until after the effective date of that insurance contract is a 'loss in progress' that precludes coverage."  Northfield Ins. Co. v. Isles of June Consulting Ltd., No. 99-CV-1186, 2001 WL 34076047, at *6 (M.D. Tenn. Sept. 26, 2001) (internal citation omitted).  "Generally, [the] doctrine embodies the principle that losses which exist at the time of the insuring agreement, or which are so probable or imminent that there is insufficient 'risk' being transferred between the insured and the insurer, are not proper subjects of insurance."  American & Foreign Ins. Co., Inc. v. Sequatchie Concrete Servs., Inc., 441 F.3d 341, 344 (6th Cir. 2006), *reh'g en banc denied* (Apr. 25, 2006) (citation and internal quotation marks omitted).

The Sixth Circuit opined in Sequatchie Concrete Services that the Tennessee courts would adopt the same definition of the loss-in-progress doctrine if the case were before it.  *See* id. at 344-45; *see also* Rothberg v. Cincinnati Ins. Co., No. 1:06-CV-111, 2008 WL 833201, at *10 (E.D. Tenn. Mar. 27, 2008) (applying loss-in-progress doctrine as articulated by Sequatchie Concrete Services to case governed by Tennessee law).  The court cited with approval the case of Inland Waters Pollution Control, Inc. v. National Union Fire Insurance Co., 997 F.2d 172 (6th Cir. 1993) in which the court found that "[t]he lesson of . . . cases defining and applying the 'loss in progress' doctrine is that the doctrine operates only where the insured is aware of a threat of loss so immediate that it might fairly be said that the loss was in progress and that the insured knew it at the time the policy was issued or applied for."  Sequatchie Concrete Servs., 441 F.3d at 345 (quoting Inland

7

Waters, 997 F.2d at 178).  "Because the 'loss in progress' doctrine . . . requires foreknowledge of loss or an awareness of an immediate threat of loss on the part of the insured," courts were instructed to determine issues of fact, including "whether [the insured] knew or should have known at the time it obtained insurance coverage with [the insurer] that [a particular problem] would result in damage . . . or that [it] posed an immediate threat of damage . . ."  Id. at 346 (citing Inland Waters, 997 F.2d at 178-79).  "The loss in progress doctrine's basic premise is that insurance policies are intended to protect insureds against risks of loss; not losses that have already taken place or are substantially certain to occur.  Accordingly, the doctrine is properly invoked when the insured 'knows' about the claimed loss before the policy is purchased."  New Hampshire Ins. Co. v. Knoxville Cast Stone, Inc., 433 F. Supp. 2d 879, 884 (E.D. Tenn. 2004), aff'd sub nom. American & Foreign Ins. Co., Inc. v. Sequatchie Concrete Servs., Inc., 441 F.3d 341 (6th Cir. 2006), reh'g en banc denied (Apr. 25, 2006) (citing Aetna Cas. & Sur. Co. v. Dow Chem. Co., 10 F. Supp. 2d 771, 789 (E.D. Mich. 1998)) (internal quotation marks omitted).

In support of its position, the Plaintiff points to an inspection report prepared by Cook's Pest Control on March 22, 2001.  The report indicated the presence of fungus and moisture problems, and recommended more foundation vents.  Moisture readings for plumbing areas were listed at twenty to twenty-eight percent and the subfloor at eighteen to twenty-four percent.  The report stated that "[m]oisture content of 20% or greater promotes wood decay and insect infestations.  If action is not taken to reduce the wood moisture content, damage to the structure is likely to occur."  (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 8 (Cook's Pest Control Report dated Mar. 22, 2001) at Bates stamp RHL 01292.)  Thus, the Plaintiff posits, RHL was on notice as early as March 22, 2001 of problems associated with water intrusion into the complex's crawl space.  In

another inspection report issued four days later, Cook's further noted "extreme heavy moisture," "heavy fungus" and mold in the crawl space. (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 9 (Cook's Pest Control Report dated Mar. 26, 2001) at Bates stamp RHL 01299.)

Following an inspection on June 18, 2002, Cook's reported that "vent wells need to be clear of dirt and debris" and recommended "consulting someone about runoff water from [the] hill behind [the ] left wing." (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 10 (Cook's Pest Control Report dated June 18, 2002) at Bates stamp RHL 01289.) Moisture was again observed to be in excess of twenty percent. (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 10 (Cook's Pest Control Report dated June 18, 2002) at Bates stamp RHL 01289.) At that time, however, neither moisture barrier installation nor additional ventilation was recommended. (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 10 (Cook's Pest Control Report dated June 18, 2002) at Bates stamp RHL 01289.)[2]

In a report issued on June 26, 2003, the inspector noted siding and other wood in contact with the ground, as well as moisture meter readings from seventeen to twenty percent. (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 11 (Cook's Pest Control Report dated June 26, 2003) at Bates stamp RHL 01287.) The report contained the following advisory:

> Any exterior siding, such as wood, vinyl, stucco, Exterior Insulation and Finish Systems (EIFS - sometimes referred to as Dryvit or Foam Board), or any other type of siding/wood which comes in contact with the ground or extends below the ground level can create a termite/moisture problem. Not only does such a condition make the foundation of the structure inaccessible to a visual inspection, it also creates an unseen route for termites to enter the structure. In addition, many types of siding are

---

[2] It is unclear whether drainage work was recommended, as the inspector checked both the "yes" and "no" boxes with respect to that recommendation. (*See* Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 10 (Cooks Pest Control Report dated June 18, 2002) at Bates stamp RHL 01289.)

> prone to moisture infiltration and may actually wick moisture up from the ground,
> thereby increasing the likelihood of a termite infestation.  Since your property may
> have such a problem, we wanted to bring this situation to your attention and explain
> it in more detail.

(Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 11 (Cook's Pest Control Report dated June 26, 2003) at Bates stamp RHL 01288.)

The June 17, 2005 report reflected no wood contact with the ground, but "[twenty to ninety percent] moisture in [the] crawl space [and] large amounts of standing water throughout [the] crawl [space]."  (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 12 (Cook's Pest Control Report dated June 15, 2005) at Bates stamp RHL 01285.)  The document stated that "[a] high moisture reading indicates a high moisture content which may promote wood decay and insect infestation for which the customer should promptly consider corrective action."  (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 12 (Cook's Pest Control Report dated June 15, 2005) at Bates stamp RHL 01285.)

The Cook's report dated May 1, 2006 again reflected no wood contact with the ground and a high moisture reading, this time of eighteen to thirty percent.  The inspector also advised that "you need to clean all vent wells out so air can circulate.  Has moisture barrier one side is real damp on ground needs to air out [sic]."  (Mem. in Supp. of State Auto. Mut. Ins. Co.'s Mot for Summ. J., Ex. 13 (Cook's Pest Control Report dated May 1, 2006) at Bates stamp RHL 01283.)

In response, RHL cites to the deposition testimony of Scarborough and Robert Howell Little, the owner of the complex.  Little was questioned about the 2006 Cook's report, which he claimed he had not seen prior to the summer of 2007.  (Dep. of Robert Howell Little ("Little Dep.") at 18.) According to Little, the resident manager or property manager would have taken care of cleaning out the vent wells without reporting it to him.  (Little Dep. at 18.)  He stated that "[i]n fact, as I

10

recall, they also recommended we put in some additional vent openings to create more circulation under the building and that was done by the manager, as well." (Little Dep. at 18-19.) With respect to standing water, Little testified as follows:

Q:      . . . were you ever made aware that there was water standing in the bottom of the elevator shaft at this property?

A:      Yes.

Q:      When did you become aware of that?

A:      Off and on intermittently there would be a problem with it.  And again, it would only come to my attention normally when someone was doing some kind of inspection.  The elevator company was making an inspection and we would have some concern about where the water was coming from and what was going on.

                              *          *          *

Q:      Let me show you an inspection report from June 17, 2005 and draw your attention to the comments from Cook's Pest Control.

A:      Okay.

Q:      Do you see where those comments include large amounts of standing water throughout the crawl?

A:      Yeah.

Q:      Were you ever made aware of the content of this pest control report prior to the litigation?

A:      No.

Q:      Should you have been?

A:      If it were resulting from a problem, i.e., a buildup of mold and stuff that we had, yes.  But they're reporting it's a water problem and my manager, what she would do in her -- is work with them, because they thought it was a ventilation problem under the building.

Q:      You mentioned that additional vents were added at some point in time.  Do

11

you recall when that was done?

A:     No.

(Little Dep. at 19, 22.)

Scarborough recalled that, in 2002, in response to Cook's report concerning high moisture readings, "we did change out the vents in the front of the building for moisture. . . [t]he front of the building, the frame, the drains, they put us in some new ones for moisture so we did respond to that." (Dep. of Ramona Scarborough ("Scarborough Dep.") at 29.)  She could not remember being aware of problems in the crawl space between 2005 and 2006, the content of any verbal report she received from RamJack or whether a RamJack representative told her there was standing water in the crawl space.  (Scarborough Dep. at 38.)  She expressed surprise at the amount of water RamJack advised was under the building but knew from Cook's prior to that time that moisture was present. (Scarborough Dep. at 38-39.)  Scarborough understood "moisture" to mean "[j]ust damp from sweating and being hot under the building."  (Scarborough Dep. at 39.)  She was aware that if the moisture was not controlled, mold would form.  (Scarborough Dep. at 39.)

Viewing the facts in the light most favorable to the insured, the Court finds there is a question of fact concerning whether RHL knew or should have known at the time it obtained insurance coverage with State Auto that the water issues would result in damage or posed an immediate threat of damage, rendering summary judgment based on the loss-in-progress doctrine unwarranted.  *See* Inland Waters, 997 F.2d at 178 (summary judgment not appropriate when material issue of scope of insured's foreknowledge of eventual loss remains unresolved).

_Interpretation of Insurance Contract._

*General Principles.*

12

At this point, the issue before the Court is the appropriate interpretation of the Policy.  "This question is a matter of law conducive to determination on cross-motions for summary judgment." Montclair Condo. Ass'n, Inc. v. Cmty. Ass'n Underwriters of Am., Inc., No. 3:08-0718, 2009 WL 2043869, at *3 (M.D. Tenn. July 9, 2009).  The general principles of contract construction of insurance policies under Tennessee law are as follows:

> Insurance contracts are subject to the same rules of construction and enforcement as apply to contracts generally.  As a result, disputed contractual language must be examined in the context of the entire agreement and the policy construed as a whole in a reasonable and logical manner.  Further, words must be given their usual and ordinary interpretation.  The goal is to ascertain and enforce the intent of the contracting parties.  Hence, where a policy's terms are unambiguous, it will be enforced as written, and a court cannot rewrite an unambiguous policy simply to avoid harsh results.

Chad Youth Enhancement Ctr., Inc. v. Colony Nat'l Ins. Co., No. 3:09-0545, 2010 WL 455252, at *8 (M.D. Tenn. Feb. 2, 2010) (internal citations and quotation marks omitted).  "[T]he insurance policy and its endorsements should be construed as a whole, in a reasonable and logical manner." Wimpee v. Grange Mut. Cas. Co., No. W2002-02795-COA-R3-CV, 2003 WL 24213899, at *3 (Tenn. Ct. App. Dec. 31, 2003).

> When coverage questions arise, the courts should consider the components of an insurance policy in the following order:  (1) the declarations, (2) the insuring agreements and definitions, (3) the exclusions, (4) the conditions, and (5) the endorsements.   Therefore,  the  insured  cannot  simply  focus  on  the declarations/summary portion of a contract in isolation; the policy must be read as a whole.
>
> While insurance policies are construed as contracts, courts do not shut their eyes to realities; they know that the policy is a contract of "adhesion," i.e. not one which the parties have reached by mutual negotiation and concession, not one which truly expresses any agreement at which they have arrived, but one which has been fixed by the insurer and to which the insured must adhere, if he chooses to have insurance. Accordingly, insurance policies are construed in favor of the insureds and so as to provide coverage.

Chad Youth Enhancement Ctr., 2010 WL 455252, at *8 (internal citations and quotation marks omitted).  Moreover, "[e]xceptions, exclusions, and limitations in policies of insurance are to be most strongly construed against the insurer." Warfield v. Lowe, 75 S.W.3d 923, 925 (Tenn. Ct. App. 2002), *app. denied* (June 3, 2002) (citing Hahn v. Home Life Ins. Co. of N.Y., 84 S.W.2d 361 (1935)) (internal quotation marks omitted).  It is the burden of the insurer to establish that an exclusion applies.  Nationwide Mut. Fire Ins. Co. v. Stanley, 403 F. Supp. 2d 638, 645 (E.D. Tenn. 2005).  "If an exclusion applies, it is the insured's burden to show that an exception to the exclusion applies." JACO Airfield Constr., Inc. v. Nat'l Trust Ins. Co., No. 05-2624 Ma/P, 2007 WL 5114438, at *6 (W.D. Tenn. Jan. 29, 2007).

*Negligent Work Exclusion.*

The Plaintiff argues that coverage is barred under the Policy's "Negligent Work" exclusion. State Auto avers that changes in grading behind the north side and center area of the apartment building were made during construction; the structure did not have a French drain system; foundation vents were installed below grade level; light wells were installed which allowed water to collect and enter the crawl space through the foundation vents; and the foundation walls were not waterproofed.  State Auto, in support of its position, cites to page 37 of the deposition of Eddie Bolton of RamJack, who testified that water began to seep into the crawl space shortly after the apartments were constructed.  (Dep. of Eddie Bolton at 37.)  However, in none of the portions of his deposition provided to the Court by the Plaintiff does Bolton opine that faulty, inadequate or defective construction or grading was present at the site or that the loss was caused by or resulted from negligent construction or grading.  The Plaintiff also refers to the testimony of Ellison, State Auto's expert, and Neil Hall, the Defendant's expert, to the effect that the building suffered water

14

intrusion for a long period of time.

In response, the Defendant points out that, while State Auto's claims adjuster, who is not an engineer, noted the change in grading on a grading and site plan (*see* Dep. of B.J. Richardson ("Richardson Dep.") at 22), there is no evidence to show the change was actually made during construction. Even if it was, both Ellison and Hall testified in their depositions that they were unaware whether the alleged gradage or the placement of foundation vents below grade violated building codes in place at the time of construction. (*See* Dep. of Martin Edward Ellison ("Ellison Dep.") at 20, Dep. of Neil B. Hall ("Hall Dep.") at 9.) Hall opined that, although the construction did not violate established codes, the type of design intervention method used to deal with the issue of water intrusion was a cheaper solution, based on a cost-benefit analysis, that did not require installing French drains and waterproofing the foundation wall, work that was eventually performed by RamJack. (Hall Dep. at 9-10.)

While the original construction may not have utilized the best, and likely most expensive, options for water control, it has not been demonstrated by State Auto that the method used was negligent. Nor has it shown that the fact of water intrusion naturally equates to negligent construction or grading. Thus, the Court is unconvinced that the burden of establishing application of the Negligent Work exclusion has been satisfied. *See* Tastee Treats, Inc. v. U.S. Fid. & Guar. Co., Civil Action No. 5:07-cv-00338, 2008 WL 2836701, at *6 (S.D. W.Va. July 21, 2008) (insurer, which had burden to show negligent maintenance, had failed to show facts supporting its assertion and, thus, had not met burden of establishing Negligent Work exclusion applied).

*Water Exclusion.*

The Plaintiff contends that the Policy prohibits coverage for water damage under the "water"

15

exclusion.  The particular types of water damage listed in the exclusion at issue here include those due to "flood," "surface water" and ""water under the ground surface pressing on, or flowing or seeping through . . . foundations."  The following testimony was elicited from RHL's expert:

Q:      Okay.  I want to focus on water now.  In your opinion, what are the sources of water in the crawl space that contributed to the damage you have identified?

A:      Water -- surface water ran down the slope, filled the light wells by the -- they wouldn't be light wells -- the wells by the vents and got in through the vents. Water -- groundwater following the profile of the surface drained downslope and penetrated through the foundation wall, and then water in the water table due to the relative level of the floor of the crawl space compared to higher ground, there was some Artesian flow which allowed water to hydrostatically come up through the floor of the crawl space.  There might be a fourth source -- but I haven't confirmed it -- based on what I saw the worst damage, directly under the laundry room, and the fact that there was a double floor and there were metal pans in the laundry room, all that suggests to me that there was a leak problem in the laundry room, which contributed water to the problem, but I haven't confirmed there was a leak.

(Hall Dep. at 14-15.)

Q:      . . . I want to go back and talk about each of the sources of water that you do have an opinion on then, and let's start with the Artesian flow.  You said that was related to the water table?

A:      Yes.

Q:      All right.  Explain how water would come into the crawl space area under this method.

A:      Well, the -- when it rains, if it's raining upslope, the water is going to percolate upslope into the ground, find the water table, and where you have a cut area, generally the cut surface is going to be closer to the water table than the uncut surface.  What impressed me looking at the area upslope was the number of trees that appeared to have been cut for development.  A possibility, again, which I can't confirm, but a strong possibility is that when the area was originally -- when the building was originally constructed, if there were trees that were essentially the transevaporation taking up all of the water as it rained, it wasn't percolating into the ground because the trees were capturing the water, they cut the trees, it created a problem.  One, you've got

16

a runoff problem with the water that's now going to come down the surface, and then you've got a problem with water that's getting into the ground that's going to follow the surface profile, and then it's also going to get down to the water table, locally raise the water table, and the place that's going to feel that impact is the area that's been cut.

*    *    *

Q:    . . . when would water have begun to enter the crawl space through the Artesian flow method you described?

A:    It depends more on the conditions outside the building line than the building itself. I don't -- I can't truly tell you.

Q:    What outside conditions would be relevant?

A:    Well, the seasonal water table that you might be able to get off the USDA soil survey map -- soil survey report, information about the ground cover upslope, were there trees, when were they cut, what development upslope of the site, did they add storm drains, did they asphalt surfaces that increased the amount of runoff. What conditions upslope would have changed the amount of water headed towards the building? That's more important to know than what happened at the building itself when it was constructed.

Q:    All right. The second method that you talked about was groundwater entered the crawl space, percolating up, I guess, through the floor of the crawl space and entering the crawl space?

A:    Well, I had groundwater twice, once when it just followed the profile and came in through the foundation wall.

Q:    Right.

A:    And the other time Artesian flow where it came up underneath the building.

Q:    You have told me about Artesian flow, and I think you just told me about groundwater, following the profile, but go ahead and do that so that I'm clear.

A:    Yeah, I mean, that's pretty much water coming from upslope would percolate into the ground, but it's not going directly down into the water table. It's also going to move -- depending on the soil profiles, is that a fragipan clay layer that's going to capture the water and push it downslope faster, not allowing it to percolate into the ground. I haven't done any soil investigation to tell you what the profiles of the soil are and whether it was permeable,

17

impermeable, but for this area, I would expect that water would travel below the surface, parallel to the profile of the surface, and it would also get down into the water table. So both occurred. To what extent, I can't tell you which ruled.

(Hall Dep. at 16-21.) It was Hall's opinion that water that filled the light wells came in larger part from ground water than surface water. (Hall Dep. at 23.)

Thus, according to the insured's expert, the water in the crawl space came from four possible sources: (1) runoff from the slope behind the apartment building; (2) groundwater following the profile of the slope that penetrated the foundation wall; (3) artesian flow which permitted water to come up through the floor of the crawl space; and (4) a plumbing leak in the laundry room. Under Tennessee law, "flooding" occurs "where the amount of water introduced into an area exceeds the capability of its drainage system to contain the water." Wimpee, 2003 WL 24213899, at *4. "Surface water is water from melted snow, falling rain, or rising springs, lying or flowing naturally on the earth's surface, not gathering into or forming any more definite body of water than a mere bog, swamp, slough, or marsh, and lost by percolation, evaporation or natural drainage. Surface water is distinguished from the water of a natural stream, lake, or pond, is not of a substantial or permanent existence, has no banks, and follows no defined course or channel." Heller v. Fire Ins. Exch., a Div. of Farmers Ins. Group, 800 P.2d 1006, 1008-09 (Colo. 1990) (internal footnotes omitted); see also T.H.E. Ins. Co. v. Charles Boyer Children's Trust, 455 F. Supp. 2d 284, 296 (M.D. Pa. 2006), aff'd 269 F.App'x 220 (3d Cir. 2008) ("Surface water" has been defined by courts as "waters on the surface of the ground, usually created by rain or snow, which are of a casual or vagrant character, following no definite course and having no substantial or permanent existence"; "diffused over the surface of the ground"). An artesian flow refers to a "well in which water is under pressure[,] especially [] one in which the water flows to the surface naturally." Merriam-Webster

Online, http://www.merriam-webster.com/ (last visited Mar. 12, 2010).

Accordingly, the evidence gleaned from RHL's own expert reveals that the loss was caused at least in part by events falling squarely within the water exclusion. Under the anti-concurrent causation language contained in the Policy barring coverage where one or more of the enumerated causes were a contributing cause, payment would therefore be precluded. *See* Front Row Theatre, Inc. v. Am. Mfr's Mut. Ins. Cos., 18 F.3d 1343, 1348-49 (6th Cir. 1994); *see also* Davidson Hotel Co. v. St. Paul Fire & Marine Ins. Co., 136 F. Supp. 2d 901, 909 (W.D. Tenn. 2001) (noting that under Tennessee law insurer was free to contract to place an absolute exclusion on certain events by adding language to policy providing that "this exclusion applies regardless of any other cause or event that contributes concurrently or in any sequence to the loss"). Thus, even though leakage from the laundry room was not a listed event in the water exclusion provision and therefore arguably covered under the Policy, the fact that flooding, surface water and ground water contributed to the damage would operate to deny coverage.

The case of Phillips v. United Services Automobile Association, 146 S.W.3d 629 (Tenn. Ct. App. 2004), *app. denied* (Oct. 11, 2004), relied upon by RHL, does not alter the Court's conclusion. In Phillips, the plaintiff's homeowners insurer denied coverage for water damage to his home, which Phillips claimed was due to water seepage resulting from faulty design and negligent installation of a synthetic stucco system applied to the home's exterior. Phillips, 146 S.W.3d at 630. The policy at issue contained a similar water exclusion to that before the Court in this case. Id. at 632. The Phillips court determined the water damage was covered, stating that

> there are three types of water damage that are excluded from coverage: flooding, sewer back-up, and water below the ground. The plaintiff's house was damaged by water penetrating the [stucco system]. This sort of damage is neither expressly excepted nor excluded under the policy. Accordingly, we find that the policy does

19

provide coverage for the plaintiff's water damage.

Id. at 634. RHL suggests the decision stands for the proposition that *any* direct intrusion of water does not fall within the water exclusion. However, the Court does not read Phillips so broadly. This case is clearly distinguishable, as the water in the crawl space was caused by events listed in the exclusion, i.e., flooding, surface water, and/or ground water. In Phillips, water seeped through a substance applied to the outer walls of the plaintiff's home, a cause *not* listed in the exclusion. Consequently, in this Court's view, Phillips offers no assistance to the insured.

*Additional Coverage for Collapse.*

RHL submits that, even if an exclusion applies, however, the Policy provides additional coverage in the event of collapse. At the outset, the Court finds that the general exclusions listed in the Policy do not modify or qualify the additional collapse coverage. *See* Young Sook Pak v. Alea London Ltd., ___ F. Supp. 2d ___, Civil No. 1:08-CV-0824, 2009 WL 2366549, at *7 (M.D. Pa. July 30, 2009) (collapse in accordance with additional collapse coverage is a covered event notwithstanding general policy exclusion provision); 130 Slade Condo. Ass'n, Inc. v. Millers Capital Ins. Co., Civil Action No. CCB-07-1779, 2008 WL 2331048, at *6 (D. Md. June 2, 2008) (similar policy language indicates that additional collapse coverage "not modified or qualified by any of the other listed exclusions that apply instead to the general coverage provisions").[3]

The Policy does not define the term "collapse." "The Tennessee Court of Appeals has . . . adopted the majority rule that collapse coverage provisions 'which define collapse as not including cracking or settling provide coverage if there is substantial impairment of the structural integrity of

---

[3]The Court was unable to locate any Tennessee cases on this issue.

the building or any part of a building.'"[4]  Huntingdon Ridge Townhouse Homeowners Ass'n, Inc.

v. QBE Ins. Corp., No. 3:09-cv-00071, 2009 WL 4060458, at *5 (M.D. Tenn. Nov. 20, 2009) (citing

Rankin v. Generali-U.S. Branch, 986 S.W.2d 237, 238 (Tenn. Ct. App. 1998)).

Deposition testimony supports a finding of substantial impairment of the structural integrity

of part of the Trenton Apartments building.  State Auto's expert stated in his deposition as follows:

> Q:     Is it fair to say that the issues with respect to the floor joists and the beams
>        and the wood issues underneath the building at Trenton impaired the
>        structural integrity of the building? . . . The damage done -- you would agree
>        that there is damage done to the wood beams and joists underneath the
>        building at Trenton?
>
> A:     To some of the joists, yes, sir.
>
> Q:     And is it fair to say that the damage to some of the joists impaired the
>        structural integrity of the building at Trenton?
>
> A:     Yes.

(Ellison Dep. at 31.)  The following testimony was adduced at Richardson's deposition:

> Q:     Do you have an opinion as to whether it was necessary for Trenton -- the
>        apartment complex to undergo issues to fix problems underneath the building
>        at Trenton?
>
> A:     Yes.
>
> Q:     What is your opinion with respect to that?
>
> A:     They needed to shore up the floor joists.
>
> Q:     Why did they need to do that?
>
> A:     It was wet rotted.
>
> Q:     And what would be the consequence if they did not shore that up?

_____

[4]The instant Policy provides that "[c]ollapse does not include settling [or] cracking . . ."
(Policy, BP 00 02 12 99, at 4.)

> A:      Collapse of the floor system such as experienced in the 101 apartment.

(Richardson Dep. at 30-31.)  Little testified that he was advised by RamJack the building "was in

grave danger of collapsing[.]"  (Little Dep. at 37.)  Bolton explained in his deposition thusly:

> Q:      Mr. Bolton, do you have an opinion as to what would have happened had
>         y'all not performed the work that you did with respect to the Trenton
>         apartment complex?
>
> A:      Yeah, it would have collapsed, like the emergency section that we did first.
>
> Q:      So, is it fair to say that the water damage in the crawl space which severely
>         deteriorated the joists and the beams substantially impaired the structural
>         integrity of the Trenton apartment complex?
>
> A:      Yes.

(Bolton Dep. at 52-53.)

Assuming a collapse in fact occurred, coverage is available for such an event only if it results

from one of a specific set of causes, including, for purposes of the instant motions, "specified cause

of loss" and hidden decay.  (*See* Policy, BP 00 02 99, at 3.)  As noted previously herein, "specified

cause of loss" includes "water damage" that is "accidental discharge or leakage of water or steam

as the direct result of the breaking apart or cracking of any part of a system or appliance (other than

a sump system including its related equipment and parts) containing water or steam."  (Policy, BP

00 02 12 99, at  23.)

RHL cites to Hall's Building Damage Assessment in which he opines that "[w]ater may have

leaked from [the laundry room] or water may have traveled along the joists and beams from a point

source."  (Mot. for Summ. J. of RHL, Inc. d/b/a Trenton Apartments, Ltd., Ex. H at 2.)  Hall advised

that "[d]uring the course of repair, a diligent effort must be made to document conditions to help

determine if there were plumbing leaks in the Laundry Room which may have contributed to the

condition of structural failure under this part of the building." (Mot. for Summ. J. of RHL, Inc. d/b/a Trenton Apartments, Ltd., Ex. H at 2.)  RHL also refers the Court to RamJack's conclusion that "[s]evere water damage from leaks in laundry room area have completely deteriorated the floor and floor joist" (RHL 00547) and "[s]evere cracks, extreme stages of mold [and] fallen insulation is [sic] seen here in the laundry room area of the crawl space.  This is due to moisture from leaks above in water lines and drainage system." (RHL 00571.)  With respect to "water damage" as a "specified cause of loss" and its application here, therefore, the Court finds there is a genuine issue of material fact as to the existence of a collapse caused by the "specified cause of loss" that was "the direct result of the breaking apart or cracking of any part of a system or appliance (other than a sump system including its related equipment and parts) containing water or steam."

"Hidden decay," like collapse, is also not defined in the Policy.  "When called upon to interpret a term used in an insurance policy that is not defined therein, courts in Tennessee sometimes refer to dictionary definitions."  Am. Justice Ins. Reciprocal v. Hutchison, 15 S.W.3d 811, 815 (Tenn. 2000).  "Hidden" is defined as "being out of sight or not readily apparent; concealed."  Merriam-Webster Online, http://www.merriam-webster.com/ (last visited Mar. 12, 2010).  "Decay" means a "wasting or wearing away."  Merriam-Webster Online, http://www.merriam-webster.com/ (last visited Mar. 12, 2010).  Courts interpreting the term "hidden decay" have construed it to mean decay that is "not visible," "out of sight or off the beaten track; concealed," "out of sight," or "concealed."  See S.R.P. Mgmt. Corp. v. Seneca Ins. Co., Civil Action No. 06-935, 2008 WL 2039466, at *7 (E.D. Pa. May 13, 2008) (collecting cases); Wurst v. State Farm Fire & Cas. Co., 431 F. Supp. 2d 501, 505 n.7 (D.N.J. 2006).

In Seneca, on which State Auto relies, the court articulated that

23

> [i]n the establishment of this element, it is not enough for the insured to simply assert that [it] was unaware of the decay. The test must have an objective element to it -- that is to say that a reasonable insured under such circumstances would have seen or otherwise been aware of the decay. The applicable standard is that of the reasonable insured. While an insured need not affirmatively inspect the insured premises so as to uncover otherwise hidden decay and repair it before it worsens, [it] likewise cannot retreat to willful blindness or refusal to draw those conclusions a reasonable insured would draw from visible signs of deterioration or decay.

Seneca Ins. Co., 2008 WL 2039466, at *8 (citing Judge v. State Farm Ins. Cos., No. Civ. A. 92-C-03-010, 1993 WL 1611307, *3 (Del. Super. May 3, 1993)) (internal citations omitted). As pointed out by RHL, this standard has not been adopted by any court in Tennessee and the Court thus declines to apply it here.

The Plaintiff maintains that the damage was not "hidden" because the crawl space was easily accessible and the Defendant was put on notice on numerous occasions by Cook's Pest Control that water had intruded into the area. However, while the Cook's reports indicated the presence of water and mold, they did not document decay of the joists and beams and there is no evidence in the reports that decay was visible. Moreover, even Seneca would not require the insured to crawl under the building to inspect it for otherwise hidden decay. The Court finds there is a genuine issue of fact as to whether decay or deterioration of the joists, beams or other structural components was hidden. Thus, summary judgment is not warranted. *See* Sandalwood Condo. Ass'n at Wildwood, Inc. v. Allstate Ins. Co., 294 F. Supp. 2d 1315, 1319 (M.D. Fla. 2003) (summary judgment not appropriate where genuine issues of fact exist as to whether decay was hidden).[5]

*Additional Coverage for "Fungi," Wet Rot, Dry Rot and Bacteria.*

---

[5]As noted in the Policy, coverage under the collapse provision is available even if defective materials or methods contributed to the collapse where, as is the case here, it occurred after construction is complete. (*See* Policy, BP 00 02 12 99, at 3.)

24

As set forth above, this additional coverage provision applies only where "fungi," wet rot, dry rot or bacteria "are the result of a 'specified cause of loss' other than fire or lightning." (Policy, BP2171 (11/02), at 1.)  The only "specified cause of loss" potentially applicable here would be "water damage."  Thus, based upon the definition of "water damage" under the Policy, coverage would be limited to that resulting from leaks in and around the laundry room.  *See supra* discussion at 22-23.  Moreover, such damage must, in order for coverage to be provided, occur "during the policy period."  (Policy, BP2171 (11/02), at 1.)  The policy period is defined in the Policy as the period "shown in the Declarations," which is from April 14, 2007 to April 14, 2008.  (Policy, BP 00 02 12 99 at 19; BOP0001 (07/00) p. 001 of 007.)  RHL acknowledges that leaks in the laundry room caused deterioration over time.  The only evidence presented by the Defendant that would support a conclusion that damage occurred during the period from April 14, 2007 to April 14, 2008 is the deposition testimony of Bolton at pages 23 to 24, neither of which were attached to RHL's brief. However, page 23 was appended to State Auto's filings.  Therein, Bolton was asked "At any time that you have been in any of the crawl spaces at the Trenton Apartments, have you seen water entering the crawl space from any source?"  (Bolton Dep. at 23.)  Bolton replied, "No, I have not." (Bolton Dep. at 23.)  The last line of the page contained a portion of a question:  "Okay, have you observed any active . . ."  (Bolton Dep. at 23.)  Absent the ability to review the remainder of the question and its answer, the Court is unwilling to engage in speculation.

RHL's expert reported that

[t]he proximity of these structural members [(joists and beams)] to the Laundry Room may be of some consequence.  Donan notes aged deterioration and rot below the laundry room area, but discounts the significance of this condition because additional subflooring was noted in this area.  To the contrary, the additional subflooring may be a repair placed over wood-framing members which at the time appeared undamaged despite having absorbed excessive moisture.  Without the

25

> ability to dry, in time these wood-framing members became subject to rot.  During
> the course of repair, a diligent effort must be made to document conditions to help
> determine if there were plumbing leaks in the Laundry Room which may have
> contributed to the condition of structural failure under this part of the building.

(Mem. in Supp. of Mot. for Summ. J. & Statement of Undisputed Facts for R.H.L., Inc. d/b/a

Trenton Apartments, Ltd., Ex. H at 4.)  In addition, Scarborough, who had worked as site manager

at the Trenton Apartments since September 1996, stated in her deposition that any repairs performed

in the laundry room area, including the placement of a metal pan under the washing machine, must

have occurred prior to her employment.  (Scarborough Dep. at 18-19.)  In light of the Defendant's

failure to establish that the damage resulting from "fungi," wet rot, dry rot or bacteria occurred

during the policy period, the limited coverage for such an event has no application.

_Bad Faith Claim under Tennessee Law._

RHL has counterclaimed in this matter for bad faith pursuant to Tennessee Code Annotated

§ 56-7-105, which provides that

> [t]he insurance companies of this state, and foreign insurance companies and other
> persons or corporations doing an insurance . . . business in this state, in all cases
> when a loss occurs and they refuse to pay the loss within sixty (60) days after a
> demand has been made by the holder of the policy . . . on which the loss occurred,
> shall be liable to pay the holder of the policy . . ., in addition to the loss and interest
> on the bond, a sum not exceeding twenty-five percent (25%) on the liability for the
> loss; provided, that it is made to appear to the court or jury trying the case that the
> refusal to pay the loss was not in good faith, and that the failure to pay inflicted
> additional expense, loss, or injury including attorney fees upon the holder of the
> policy . . .; and provided, further, that the additional liability, within the limit
> prescribed, shall, in the discretion of the court or jury trying the case, be measured
> by the additional expense, loss, and injury including attorney fees thus entailed.

In order to demonstrate a claim for bad faith, a plaintiff must show "(1) that the insurance

policy, by its terms, became due and payable; (2) that a formal demand for payment was made; (3)

that the insured waited sixty days after making demand before filing suit; and (4) that the insured's

26

refusal to pay was not in good faith." <u>Fulton Bellows, LLC v. Federal Ins. Co.</u>, 662 F. Supp. 2d 976, 996 (E.D. Tenn. 2009) (citation omitted).  "[I]f an insurer asserts a defense in good faith, the bad faith penalty may not be imposed even if the defense is unsuccessful." <u>Id.</u> (citation omitted).  "To sustain a claim for failure to pay in bad faith a plaintiff must demonstrate there were no legitimate grounds for disagreement about the coverage of the insurance policy." <u>Id.</u> (citation and internal quotation marks omitted).

The Court finds dismissal of the bad faith claim appropriate in light of what it considers good faith defenses to liability asserted by the insurer, even if they may ultimately be unsuccessful. Although it has determined herein that certain exclusions and the loss-in-progress doctrine did not apply, the Court declines to conclude State Auto had no legitimate grounds for its contentions.

*CONCLUSION*

For the reasons set forth herein, the parties' cross-motions for summary judgment are GRANTED IN PART AND DENIED IN PART.  Specifically, the Court finds that the loss-in-progress doctrine does not mandate summary judgment in favor of State Auto; the Plaintiff has failed to establish application of the Policy's Negligent Work exclusion; even though the Policy's Water exclusion does apply, there is a genuine issue of material fact as to whether the Policy's additional coverage for collapse nonetheless provides for recovery; the additional limited coverage for "fungi," wet rot, dry rot and bacteria does not apply; and RHL's counterclaim for bad faith is dismissed.

IT IS SO ORDERED this 12th day of March 2010.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

27